# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RICHARD FRANK, On Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL MULLEN and B. RILEY FINANCIAL, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 2023-0381-MTZ |

## MEMORANDUM OPINION

Date Submitted: January 22, 2025
Date Decided: May 5, 2025

Blake A. Bennett, Dean Roland, COOCH & TAYLOR, P.A., Wilmington, Delaware; Juan E. Monteverde, Miles D. Schreiner, MONTEVERDE & ASSOCIATES PC, New York, New York; Michael J. Palestina, KAHN SWICK & FOTI, LLC, New Orleans, Louisiana, *Attorneys for Plaintiff Richard Frank.*

Raymond J. DiCamillo, Sandy Xu, Nicholas F. Mastria, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Adam S. Paris, Michael S. Drell, Emily D. Olsen, SULLIVAN & CROMWELL LLP, New York, New York, *Attorneys for Defendants B. Riley Financial, Inc. and Michael Mullen.*

**ZURN, Vice Chancellor.**

A former stockholder of National Holdings Corporation ("National" or the "Company") brings this putative class action challenging the 2021 sale of National to its largest stockholder, B. Riley Financial, Inc. ("BRF"). The plaintiff did not sue National's board: instead, he brought breach of fiduciary duty claims against BRF and National's former Chairman and CEO.

This opinion addresses BRF's motion to dismiss the claim against it. The plaintiff contends BRF controlled National for purposes of the 2021 sale, making it a conflicted transaction subject to entire fairness review. At the time, BRF owned 46.4% of National's stock and appointed one nonvoting observer to National's board. The plaintiff claims BRF controlled the merger process by controlling the negotiations in the shadow of its significant stake. From there, the plaintiff asserts the transaction was marred by an unfair process and unfair price.

The complaint fails to support a reasonable inference that BRF controlled National for purposes of the merger such that it owed any fiduciary duties. The claim against BRF is dismissed.

## I.  BACKGROUND[1]

National is a Delaware corporation headquartered in New York City.[2]  It operates as a full-service investment banking and asset management firm.[3]  National's business includes investing in early-stage companies.[4]  Before BRF took National private, it was publicly traded.[5]

In March 2012, BRF's co-CEO Bryant Riley participated in an investment into National through National Securities Growth Partners, LLC ("NSGP").[6]  NSGP's principals included Riley and Robert Fagenson.[7]  After NSGP's investment,

---

[1] Unless otherwise noted, the following facts are drawn from the plaintiff's Verified Class Action Complaint and the documents incorporated by reference therein.  *See* Docket Item ("D.I.") 1 [hereinafter "Compl."]; *see Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 96 n.2 (Del. 2013) ("A judge may consider documents outside of the pleadings only when [] the document is integral to a plaintiff's claim and incorporated in the complaint[.]" (citing *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 612 (Del. 1996))).  Citations to the transcript for the oral argument on BRF's motion to dismiss are "Hr'g Tr. at ___," available at D.I. 48.  Citations to Plaintiff's Brief In Opposition to Defendant BRF's Motion to Dismiss are "Pl. Ans. Br. at ___," available at D.I. 32.

[2] Compl. ¶ 17.

[3] *Id.*

[4] *Id.* ¶¶ 17, 95.

[5] *Id.* ¶ 17.

[6] *Id.* ¶¶ 10, 18.

[7] *Id.* ¶ 18.

Riley and Fagenson joined National's board; Riley stepped down within months.[8]

The plaintiff attributes NGSP's interest in National to BRF.[9]

### A. BRF Invests In National.

BRF itself offered to buy National in November 2014, May 2015, and October 2015, but nothing came of it.[10] In November 2018, BRF acquired 56.1% of National's stock and entered into a standstill agreement (the "Standstill Agreement").[11] As best as can be discerned from the complaint,[12] that deal gave BRF board observer rights, waived Section 203 of the Delaware General Corporation Law ("DGCL"), and required a waiver for BRF to propose taking National private.[13] BRF named Riley as its observer.[14]

---

[8] *Id.* ¶ 18 n.3.

[9] *Id.* ¶ 18.

[10] *Id.* ¶¶ 18–20.

[11] *Id.* ¶ 26.

[12] The complaint does not describe the Standstill Agreement's terms or attach a copy of that agreement.

[13] Compl. ¶ 26; *see, e.g.*, *id.* ¶¶ 30–31 (alleging BRF's "need for a waiver from the Standstill Agreement" to make a proposal to National); *id.* ¶¶ 32–33 (alleging the board authorized a "limited waiver of the Standstill Agreement" and BRF subsequently "sent a letter to the [b]oard" indicating its intent to acquire National shares it did not already own); *id.* ¶ 34 (alleging "without the waiver, BRF could not proceed with its quest to acquire the shares of National it did not yet own").

[14] *Id.* ¶ 10.

Shortly after its investment, BRF identified National's "executive and board compensation [wer]e materially above appropriate levels."[15] In 2019, it twice urged the board to cut management compensation.[16]

## B. BRF Bids To Take National Private.

On April 27, 2020, BRF asked the board for permission to submit a take-private proposal.[17] By then, BRF's stake had declined to 46.4%.[18] National's second-largest shareholder, Daniel Asher, held 18% at that time.[19] Defendant Michael Mullen was National's CEO and Chairman.[20] National's board also included nonparties Fagenson, Barbara Creagh, Jeff Gary, Daniel Hume, Nassos Michas, and Michael Singer.[21]

On April 30, National's board granted BRF a limited waiver of the Standstill Agreement.[22] That same day, BRF submitted its first bid: $2 per share for all outstanding National shares it did not already own.[23] The offer excluded shares held

---

[15] *Id.* ¶ 27.

[16] *Id.*

[17] *Id.* ¶ 30.

[18] *Id.* ¶ 36.

[19] *Id.* ¶ 45.

[20] *Id.* ¶ 8.

[21] *Id.* ¶¶ 11–16. Michas resigned from the board on or about August 31, 2020, months before the merger agreement was approved and executed. *Id.* ¶¶ 15, 75.

[22] *Id.* ¶ 33.

[23] *Id.*

by management, citing dilution concerns tied to equity awards that would accelerate upon a change of control.[24] BRF publicly disclosed both the waiver and its proposal.[25]

On May 5, the board discussed BRF's bid and determined to enforce procedural safeguards set out in *Kahn v. M & F Worldwide Corporation* ("*MFW*").[26] It required that any transaction must meet two non-negotiable conditions: approval by an independent special committee, and approval or tender by a majority of the minority stockholders unaffiliated with BRF.[27] At that meeting, the board formed a special committee comprising Creagh, Gary, Hume, and Michas.[28] The special committee retained Skadden, Arps, Slate, Meagher & Flom LLP as its legal advisor and Keefe, Bruyette & Woods, Inc. ("KBW") as its financial advisor.[29]

At its first meeting, the special committee recognized BRF was "a large stockholder," and discussed it "could potentially be viewed as a controlling stockholder."[30]

---

[24] *Id.* ¶¶ 33, 53, 56, 63, 73.

[25] *Id.* ¶ 33.

[26] 88 A.3d 635 (Del. 2014), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018); *see* Compl. ¶ 35.

[27] Compl. ¶ 35.

[28] *Id.*

[29] *Id.* ¶¶ 41, 44.

[30] *Id.* ¶ 36.

### C. Management Submits A Competing Bid.

Management opposed the sale.[31] They believed National should stay independent.[32] On May 8, they presented a growth plan to the board, pushing back against a deal with BRF.[33] Riley sat in as an observer.[34] Later that day, management formed a consortium (the "Management Consortium") and proposed buying up to five million National shares at $2.75 per share.[35]

Faced with competing offers, the special committee met at least six times in the weeks that followed.[36] It ordered Mullen not to discuss management's bid with BRF or anyone else.[37] It insisted that BRF's offer include full *MFW* protections.[38] And it instructed KBW not to begin negotiations until BRF confirmed those conditions.[39] It predicted BRF would not support the Management Consortium's proposal or any alternative bid.[40] BRF confirmed that stance: upon learning of

---

[31] *Id.* ¶¶ 37, 40.

[32] *Id.* ¶ 40.

[33] *Id.* ¶ 37.

[34] *Id.* ¶ 38.

[35] *Id.* ¶ 39.

[36] *See, e.g.*, *id.* ¶¶ 42–46, 48.

[37] *Id.* ¶¶ 36, 44, 45.

[38] *Id.* ¶¶ 45, 48.

[39] *Id.* ¶ 48.

[40] *Id.*

management's bid, BRF said it had no intention of selling its stake.[41] On June 3, the special committee decided not to reach out to any other potential buyers.[42]

### D.    The Special Committee Negotiates With BRF.

On June 4, BRF resubmitted its $2 offer, formally conditioned on the *MFW* protections and again excluding management's shares.[43] BRF presented the special committee with projected cost savings, including cuts to management compensation and similar savings it had achieved at other companies.[44]

Seeing their compensation at risk under BRF's plan, management presented the special committee with a revised proposal.[45] They proposed to buy up to five million shares from Asher and Riley, but not shares held by any minority stockholders.[46] If that failed, their backup plan was to have National issue up to five million new shares and use the proceeds to fund growth.[47]

The special committee recognized it had more leverage to negotiate with BRF before the standstill expired.[48] It began evaluating BRF's proposal and preparing a

---

[41] *Id.*

[42] *Id.*

[43] *Id.* ¶ 49.

[44] *Id.* ¶ 50.

[45] *Id.* ¶ 51.

[46] *Id.*

[47] *Id.*

[48] *Id.* ¶ 52.

response. It directed management and KBW to prepare updated projections to assess National's value.[49] Those projections were presented in late June.[50] Based on that data, the special committee countered on June 29 with an offer of $2.75 per share.[51] The counteroffer asked BRF to extend its bid to "all stockholders," including management.[52] BRF responded with two conditions: management could not tender their shares, and they had to renegotiate their equity awards to address dilution.[53] BRF asked for the special committee's approval to negotiate those terms directly with management.[54]

The special committee knew BRF would not back another deal or sell its stake, to the Management Consortium or anyone else.[55] On July 12, the special committee decided to focus on BRF alone and work toward a better price.[56] On July 15, the special committee countered at $3.25.[57] BRF responded on July 24 with $2.75— again conditioned on *MFW*—but stated it could go to $3.25 if it could reach a deal

---

[49] *Id.* ¶¶ 53, 55.

[50] *Id.* ¶ 55.

[51] *Id.* ¶ 56.

[52] *Id.*

[53] *Id.*

[54] *Id.* ¶ 62.

[55] *Id.* ¶¶ 48, 52, 63, 64.

[56] *Id.* ¶ 63.

[57] *Id.* ¶ 65.

over management compensation.[58]

The special committee did not respond right away.[59] On July 28, Riley filled the silence: he "stated that if the proposed transaction did not proceed, [BRF] intended to affect a change-of-control transaction after the Standstill Agreement expired."[60] Two days later, the special committee moved forward: it told Mullen the special committee's decision to exclusively pursue a transaction with BRF, and authorized Riley and management to negotiate compensation and equity awards.[61]

From July 31 to August 21, Riley and management (mostly Mullen) negotiated compensation but failed to reach a deal.[62] As talks broke down, BRF saw two options: wait for the standstill to expire to buy more shares, or sell its stake.[63] BRF "hoped" the latter option could also be made available to Asher, National's second-largest stockholder, and Mullen looked for buyers for their shares.[64] On August 26, BRF withdrew its proposal and filed a Schedule 13D/A.[65]

---

[58] *Id.* ¶ 66.

[59] *Id.* ¶ 67.

[60] *See id.*; Hr'g Tr. at 18. The complaint does not plead when the Standstill Agreement expired. While I cannot consider this fact on BRF's motion to dismiss, at oral argument BRF's counsel offered that the expiration date was "towards the beginning of 2021." *See* Hr'g Tr. at 18.

[61] Compl. ¶ 67.

[62] *Id.* ¶¶ 69–70.

[63] *Id.* ¶ 70.

[64] *Id.* ¶¶ 70, 72.

[65] *Id.* ¶ 73.

10

With BRF's exit, the Management Consortium saw an opening.[66]  The special committee did not see it that way and recommended ending the sale process.[67]  The board decided to hear management's pitch.[68]  Management's presentation called out "[BRF's] partnership with Asher" as a concern and contended their "controlling ownership" suppressed the stock price.[69]

### E.    Asher Increases His Stake.

At this point, Asher entered the chat.  He was dissatisfied with National's performance.  On September 7, he sent a letter to the board and management criticizing National's results and calling for changes to leadership and governance.[70]  Mullen met with Asher to discuss those concerns.[71]

Four days after Asher's letter, Riley emailed the board's counsel to share his own frustration with National's performance (the "September 11 Email").[72]  He wrote that although he would be "better served staying quiet and not 'threatening' the board," National was "by far the worst performing financial services company

---

[66] *Id.* ¶ 75.

[67] *Id.*

[68] *Id.*

[69] *Id.* ¶ 76.

[70] *Id.* ¶ 77.

[71] *Id.* ¶ 79.

[72] *Id.* ¶ 78.

that I track, fraught with conflicts and corporate governance issues."[73] He closed by declaring, "I won't stop holding you, management, and the board accountable."[74] The complaint suggests Mullen then connected with Riley, who conveyed BRF's renewed interest in acquiring National.[75]

With pressure from National's two largest stockholders, the board met on September 15.[76] Mullen updated the board on his talks with Asher and BRF's rekindled interest.[77] The board agreed to reconstitute the special committee to negotiate with BRF and address management compensation.[78] The board also sought to understand "how [Mullen's] compensation arrangement . . . was arrived at," and weighed inviting "outside advisors to participate" and to address "remaining open points (including compensation-related points)."[79]

On September 17, 2020, Asher filed a Schedule 13D disclosing a 19.55% stake in National and his recent conversations with the board.[80] The plaintiff alleges

---

[73] *Id.*

[74] *Id.*

[75] *Id.* ¶ 79.

[76] *Id.*

[77] *Id.*

[78] *Id.* The plaintiff does not allege that the board formally reconstituted the special committee at that meeting. *Id.* But later allegations suggest it happened. *See id.* ¶¶ 84–85 (alleging that by September 16, "the reconstituted special committee met to review" certain recent events).

[79] *Id.* ¶ 79.

[80] *Id.* ¶ 80.

Asher did so "as if [he was] acting in concert" with BRF.[81]

### F. BRF Reengages, And The Merger Closes.

After the board reconstituted the special committee, Riley connected with Mullen.[82] They made progress on the management equity awards issue and "outlined" a possible solution.[83] Riley then told the board he believed the matter "can be resolved."[84] Riley reassured the board's counsel that he could work out a deal with Mullen and was "now calling Asher."[85]

The reconstituted special committee then reviewed the recent developments involving BRF and Asher.[86] It asked about the "relationship between BRF and [] Asher."[87] It also directed its counsel to question BRF's counsel about that relationship.[88] The plaintiff does not allege anything came out of those inquiries. The special committee considered that "BRF's support was necessary for the [Management] Consortium's proposal to proceed," and noted BRF's recent signal

---

[81] *Id.*

[82] *Id.* ¶ 81.

[83] *Id.*

[84] *Id.* ¶ 82.

[85] *Id.* ¶ 84.

[86] *Id.* ¶ 85.

[87] *Id.*

[88] *Id.*

that it was open to selling its stake.[89] The special committee again treated BRF and management as competing bidders and limited their ability to speak to each other.[90]

BRF soon clarified it would not sell its National stake, given its tentative agreement over management compensation.[91] Despite that agreement, the Management Consortium resubmitted its proposal to buy up to five million shares from Asher and BRF.[92]

With BRF's refusal to sell, the special committee determined the Management Consortium proposal was not in stockholders' best interest, and continued towards a deal with BRF.[93] It directed its advisor to facilitate compensation negotiations between BRF and management, with special committee representatives present.[94] KBW pushed BRF to raise its offer.[95] BRF declined, reiterating it would either proceed at $2.75 per share or wait for the Standstill Agreement to expire.[96] The special committee, seeing little room for price movement, prepared to seriously

---

[89] *Id.* ¶ 87.

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] *Id.* ¶ 88.

[94] *Id.*

[95] *Id.* ¶ 89.

[96] *Id.*

consider the $2.75 offer.[97]

On November 11, BRF formally renewed its July 24 offer of $2.75 subject to *MFW*.[98] On December 8, Asher disclosed his National stake had risen to 22.14%.[99] The special committee decided Asher would count as a "minority stockholder" under *MFW*.[100] BRF, management, and their affiliates would not.[101]

By that time, National's value had increased. National had invested in Palantir Technologies Inc. and Airbnb, Inc., both of which had recently gone public and enjoyed rapid stock price increases.[102] At its December 10 meeting, the board discussed whether those IPOs might entitle National to significant fees.[103] Riley attended the meeting as an observer—his first and only attendance since the deal process restarted in September.[104] The special committee came to understand the Palantir fees were significant relative to National's market capitalization.[105] It ordered management to halt all compensation talks to assess the Palantir fees' impact

---

[97] *Id.* ¶ 91.

[98] *Id.* ¶ 92.

[99] *Id.* ¶ 93.

[100] *Id.*

[101] *Id.*

[102] *Id.* ¶ 95.

[103] *Id.*

[104] *Id.*

[105] *Id.* ¶ 97.

15

on National's value.[106]

On January 5, 2021, KBW estimated the potential value impact from the Palantir fees at up to $0.74 per share.[107] The special committee countered BRF's $2.75 offer with $3.50.[108] BRF immediately replied at $3.25.[109] On January 6, the special committee accepted.[110]

The parties executed the merger agreement on January 10.[111] BRF began the tender offer on January 27, and National filed its recommendation statement.[112] The merger closed on February 25.[113]

## G. Litigation Ensues.

Just before closing, plaintiff Richard Frank ("Plaintiff") demanded inspection of National's books and records under Section 220 of the DGCL.[114] National denied the request.[115] On February 23, Plaintiff filed suit to compel inspection.[116] I held a

---

[106] *Id.*

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] *Id.*

[111] *Id.* ¶ 99.

[112] *Id.* ¶ 102.

[113] *Id.*

[114] *See Frank v. Nat.'l Hldgs. Corp.*, C.A. No. 2021-0160-MTZ (Del. Ch.) (the "Section 220 Action"), D.I. 1 Ex. A.

[115] *Id.* at D.I. 1 Ex. B.

[116] *Id.* at D.I. 1.

half-day trial on a paper record on July 15, 2022.[117] By trial, the issues had narrowed to "board and management communications."[118] On July 22, I issued a telephonic ruling denying those documents.[119]

On March 30, 2023, Plaintiff filed his class action complaint against BRF and Mullen—not National's board.[120] Plaintiff alleges the merger delivered inadequate value due to a "flawed and conflicted sales process" that fell short of *MFW*'s requirements.[121] The complaint asserts two counts: one against Mullen for breaching his fiduciary duties as an officer, and one against BRF for breaching its fiduciary duties as a controlling stockholder.[122]

Mullen answered the complaint.[123] BRF moved to dismiss the claim against it for failure to state a claim on February 15, 2024, and amended its motion on October 18.[124] The parties completed briefing on December 3.[125] I heard oral argument on January 22, 2025.[126] This opinion concludes BRF's motion to dismiss

---

[117] *Id.* at D.I. 39, D.I. 42.

[118] *Id.* at D.I. 43 at 7–9.

[119] *Id.* at D.I. 43 at 3, 21–22; D.I. 44.

[120] Compl. ¶ 1.

[121] *Id.* ¶ 115.

[122] *Id.* ¶¶ 130–41.

[123] D.I. 31.

[124] D.I. 24, D.I. 25, D.I. 29, D.I. 30.

[125] D.I. 32, D.I. 35.

[126] D.I. 47.

is granted.

## II.   ANALYSIS

BRF moves to dismiss the complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim.[127]   The pleading standards under Delaware law are minimal.[128]   On a motion to dismiss under Rule 12(b)(6) for failure to state a claim, the Court must "accept all well-pleaded factual allegations in the complaint as true, accept even vague allegations in the complaint as well-pleaded if they provide the defendant notice of the claim, [and] draw all reasonable inferences in favor of the plaintiff."[129]   The Court will grant a Rule 12(b)(6) motion if the "plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[130]

Those reasonable inferences "must logically flow from particularized facts alleged by the plaintiff."[131]   The Court need not "accept as true conclusory allegations without specific supporting factual allegations."[132]   The Court is not

---

[127] Ct. Ch. R. 12(b)(6).

[128] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[129] *Id.*

[130] *Id.*

[131] *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008).

[132] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (internal quotation marks and citations omitted).

18

"required to accept every strained interpretation of the allegations proposed by the plaintiff."[133]

Here, Plaintiff argues BRF exerted control over National for purposes of the merger, assumed fiduciary duties to National and its stockholders, and forced National into a conflicted transaction that warrants, and fails, entire fairness review.[134] Plaintiff pleads that BRF had a great deal of leverage in the negotiations. But leverage in an arm's-length negotiation is not tantamount to control over the special committee or board. The question is not what cards BRF held; the question is whether BRF controlled how the special committee played its cards. Plaintiff fails to plead facts that show BRF controlled the special committee or National's board in the merger process. BRF's motion to dismiss is granted.

## A. The Standard For Alleging A Controlling Stockholder

"Delaware law imposes fiduciary duties on those who effectively control a corporation."[135] "As a general rule, stockholders do not owe fiduciary duties to the corporation or its stockholders and are free to act in their self-interest."[136] But a

---

[133] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[134] *See, e.g.*, Compl. ¶¶ 103–12, 121–22.

[135] *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 183–84 (Del. Ch. 2014).

[136] *In re Oracle Corp. Deriv. Litig.*, -- A.3d --, 2025 WL 249066, at *11 (Del. Jan. 21, 2025) ("*Oracle II*"); *see also Voigt v. Metcalf*, 2020 WL 614999, at *10 (Del. Ch. Feb. 10, 2020) ("A stockholder that does not control the corporation is not a fiduciary and cannot be held liable for breaching non-existent duties."); *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *25 (Del. Ch. July 6, 2018) (noting

controlling stockholder is differently situated and will "assume[] fiduciary duties in certain circumstances."[137] A stockholder is controlling if she either: "(1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but '*exercises control* over the business affairs of the corporation.'"[138] When a stockholder owns less than a mathematical majority of the company's voting power, a plaintiff must plead actual control.[139]

Under recent Delaware Supreme Court precedent, a minority stockholder may exercise actual control (i) "over the corporation's business and affairs" or (ii) "over a specific transaction."[140] Plaintiff has not tried to plead general control; his theory

---

stockholder "status alone does not give rise to fiduciary duties"), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019).

[137] *Oracle II*, 2025 WL 249066, at *11; *see also In re Match Gp., Inc. Deriv. Litig.*, 315 A.3d 446, 460 (Del. 2024) ("Controlling stockholders are at times free to act in their own self-interest . . . [unless they] stand[] on both sides of a transaction and receive[] a non-ratable benefit."); *Harris v. Carter*, 582 A.2d 222, 234 (Del. Ch. 1990) ("[W]hen a shareholder presumes to exercise control over a corporation, to direct its actions, that shareholder assumes a fiduciary duty of the same kind as that owed by a director to the corporation." (citing *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 109–10 (Del. 1952))).

[138] *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *12 (Del. Ch. Mar. 28, 2018) (quoting *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994)).

[139] *Oracle II*, 2025 WL 249066, at *12 ("[A] minority stockholder can be a controlling stockholder by exercising actual control over the corporation's business and affairs or by exercising actual control over a specific transaction.").

[140] *Id.*

is limited to transaction-specific control.[141]  To allege transaction-specific control, a

plaintiff must plead facts supporting the inference that a stockholder "exercised

[141] *See* Hr'g Tr. at 8, 10, 42.  Plaintiff's Answering Brief presses both general and transaction-specific control theories.  *See* Pl. Ans. Br. at 34.  He abandoned general control at oral argument.  *See* Hr'g Tr. at 42 ("The Court:  -- I want to be crystal clear that your theory of control on opposing the motion is one of transaction-specific control?  Attorney Monteverde:  Yes, Your Honor.").

This opinion proceeds under recent Delaware Supreme Court precedent recognizing that "a minority stockholder can be a controlling stockholder by exercising actual control . . . over a specific transaction."  *See Oracle II*, 2025 WL 249066, at *11–12; *see id.* at *12 n.92 (collecting cases).  Whether Delaware law has or should have recognized transaction-specific control is subject to a lively debate before the judiciary and in academia.  *See* Individual Dir.-Appellants' Opening Br., *In re Tesla, Inc. Deriv. Litig.*, No. 534, 2024C (Del. appeal docketed Dec. 30, 2024), D.I. 41, at 17–19 (independent director appellants contending this Court has "never held expressly that transaction-specific control results in controlling stockholder status" and urging rejection of that doctrine); Answering Br. of Plaintiff-Below/Appellee, *In re Tesla, Inc. Deriv. Litig.*, No. 534, 2024C (Del. appeal docketed Dec. 30, 2024), D.I. 81 at 41–43 (plaintiff appellees contending Delaware law has long recognized transaction-specific control); Elizabeth Pollman & Lori W. Will, *The Lost History of Transaction-Specific Control*, __ J. Corp. L. __ (forthcoming 2025), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5138377 (tracing the doctrinal evolution of transaction-specific control and arguing Delaware should "jettison the concept of transactional control as a distinct concept").  As for the legislature, the DGCL was recently amended in a way that practitioners have read to remove transaction-specific control as a basis for finding a stockholder to be a controller.  *See* 8 *Del. C.* § 144(e)(2)(c) (defining a minority "controlling stockholder" by voting power and "power to exercise managerial authority over the business and affairs of the corporation"); *see, e.g.*, Richards, Layton & Finger, P.A., *Overview of the DGCL's Newly-Enacted Safe Harbor Procedures and Books and Records Regime* (Apr. 2, 2025), https://www.rlf.com/overview-of-the-dgcls-newly-enacted-safe-harbor-procedures-and-books-and-records-regime/  (last visited May 5, 2025) (noting that controlling stockholder definition "functionally excludes" transaction-specific control); Mayer Brown LLP, *Delaware Law Alert:  A Step-By-Step Approach For Boards Evaluating Conflicted Director, Officer, And Controlling Stockholder Transactions Under The Amended Delaware Corporation Law* (Apr. 14, 2025), https://www.mayerbrown.com/-/media/files/perspectivesevents/publications/2025/04/legal-update_delaware-law-alert.pdf (last visited May 5, 2025) (positing "the concept of control is . . . not with reference to individual transactions).  That amendment is not applicable to this dispute.  *See* Del. S. Substitute No. 1 for S.B. 21, 153rd Gen. Assem. § 6, 85 Del. Laws ch. 6 § 3 (2025).

actual control over the board of directors during the course of a particular transaction."[142] "[T]he *potential* ability to exercise control is not sufficient."[143]

That standard requires well-pled facts supporting a reasonable inference that the stockholder "dominated or controlled [the board's] 'corporate decision-making process'"[144] because it possesses power "so potent that independent directors . . . cannot freely exercise their judgment, fearing retribution from the controlling minority blockholder."[145]

---

[142] *Oracle II*, 2025 WL 249066, at *12 (quoting *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *20 (Del. Ch. May 22, 2000)); *see also Voigt*, 2020 WL 614999, at *12 (explaining transaction-specific control requires "facts supporting a reasonable inference that the defendant in fact exercised actual control with regard to the particular transaction" (internal quotation marks and citation omitted)).

[143] *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006).

[144] *In re Rouse Props. Inc.*, 2018 WL 1226015, at *15 (Del. Ch. Mar. 9, 2018) (internal citation omitted); *see also Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006) ("[T]he focus of the inquiry has been on the *de facto* power of a significant (but less than majority) shareholder, which, when coupled with other factors, gives that shareholder the ability to dominate the corporate decision-making process.").

[145] *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013) (internal quotation marks and citation omitted); *see also Kahn*, 638 A.2d at 1114 ("[A] plaintiff must allege domination by a minority shareholder through actual control of corporation conduct." (internal quotation marks and citation omitted)); *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *12 (Del. Ch. Oct. 24, 2014) (noting the central inquiry is whether a stockholder "actually control[s] the board's decisions about the challenged transaction"); *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006) (summarizing that transaction-specific control inquiry turns on whether a plaintiff sufficiently alleges facts indicating that defendants "have such formidable voting and managerial power that they, as a practical matter, are no differently situated than if they had majority voting control").

Pleading actual control is "no easy task."[146] It "call[s] for a holistic evaluation of sources of influence."[147] Delaware law has identified a nonexclusive list of "possible sources of influence" and "[b]roader indicia of effective control."[148] Ultimately, the inquiry turns on "the facts and circumstances surrounding the particular transaction."[149]

A take-private by a large blockholder sets the stage for a conflicted controller transaction warranting entire fairness review.[150] But where that large blockholder does not exercise actual control over the corporation's business and affairs, independent directors can still retain their presumed independence and control over

---

[146] *Larkin v. Shah*, 2016 WL 4485447, at *13 (Del. Ch. Aug. 25, 2016).

[147] *Anchorage Police & Fire Ret. Sys. v. Adolf*, 2025 WL 1000153, at *12 (Del. Ch. Apr. 3, 2025); *see also Sciannella v. AstraZeneca UK Ltd.*, 2024 WL 3327765, at *17 (Del. Ch. July 8, 2024) ("At the pleadings stage, a reasonable inference of actual control rests on the totality of the facts and circumstances considered in the aggregate."), *aff'd*, 2025 WL 946148 (Del. Mar. 26, 2025); *see also In re Vaxart S'holder Litig.*, 2021 WL 5858696, at *15 (Del. Ch. Nov. 30, 2021) ("Because the controller analysis is fact-intensive, the court is unlikely to find control unless plaintiffs can plead a 'constellation of facts' supporting control." (internal citation omitted)).

[148] *Basho Techs.*, 2018 WL 3326693, at *26–27, nn.313–25 (collecting and discussing cases illustrating the factors Delaware courts have considered in holistically evaluating actual control).

[149] *Id.* at *28.

[150] *See In re Oracle Corp. Deriv. Litig.*, 2023 WL 3408772, at *25–27 (Del. Ch. May 12, 2023) ("*Oracle I*") (tracing Delaware's "development of the fiduciary concept of the controller" based on recognizing the coercion inherent in a conflicted controller squeeze-out merger from *Kahn*, 638 A.2d 1110, to *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531 (Del. Ch. 2003), to *In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245 (Del. Ch. Jan. 25, 2016)), *aff'd*, 2025 WL 249066 (Del. Jan. 21, 2025).

23

the transaction. In arm's-length negotiations, they can keep the blockholder out of the boardroom and so keep the presumptions of the business judgment rule.[151] An independent target board may agree with—or yield to—a tough negotiator in its own business judgment: independent concession does not support an inference of control.[152] When there is an independent special committee, an independent board, and a clean process, a plaintiff cannot plead actual control over the transaction simply by pointing to a large blockholder's negotiating leverage.[153]

### B. The Complaint Fails To Allege BRF Controlled National For Purposes Of The Merger.

BRF appointed no directors to the National board, and Plaintiff asserts only one of National's six directors on the merger board has any ties to BRF. Plaintiff does not allege BRF had any operational or managerial influence over National. BRF was subject to a Standstill Agreement. And National negotiated with BRF primarily through an undisputedly independent and empowered special committee,

---

[151] *E.g.*, *Oracle I*, 2023 WL 3408772, at \*20–27 (finding post-trial the minority stockholder did not propose the transaction or control it, directly or indirectly; rather, the special committee "ran the negotiation process," was empowered, and "demonstrated a willingness to walk away from the transaction").

[152] *In re USG Corp. S'holder Litig.*, 2020 WL 5126671, at \*24 (Del. Ch. Aug. 31, 2020) (noting a board's "'[f]ear' of a corporate takeover threat—here fully justified after [the minority stockholder's] resounding victory [in a proxy contest]—is a nod to reality, not a disabling extraneous influence"), *aff'd sub nom. Anderson v. Leer*, 265 A.3d 995 (Del. 2021).

[153] *W. Nat.'l*, 2000 WL 710192, at \*23–24 (finding allegations of "arm's length bargaining" precluded the inference of transaction-specific control).

24

whose approval was required under the *MFW* conditions National imposed. Against

that backdrop, Plaintiff leans on five indicia in an effort to plead BRF exercised

actual control over National's board for purposes of the merger.

1. Stock ownership: BRF held 46.4% of National's stock.[154]

2. Voting support: BRF had backing from either Asher (raising voting power to 65%)[155] or from management (raising it to 55%).[156]

3. Board and management influence: BRF had "outsized influence" over the board and management because of its (i) purported longstanding interest in National, dating back to NGSP's 2012 investment, (ii) high water mark of ownership of 56.1% in 2018, and (iii) Riley's "business relationship" with National director Fagenson.[157]

4. Control over the merger process: BRF pushed the merger, sidelined the special committee, cut side deals with management, threatened a potential change-of-control transaction, coordinated with Asher and Mullen, and dictated the merger terms.[158]

5. Perceptions: the board and management viewed BRF as a controller.[159]

Assessing transaction-specific control requires "a holistic evaluation of" those

---

[154] Compl. ¶ 36; *see* Pl. Ans. Br. at 34–36.

[155] *See* Hr'g Tr. at 48–49. At the time of the merger, BRF held 46.4%. Asher held 22.14%. Their combined voting power was approximately 68.54%. Compl. ¶¶ 36, 93. Plaintiff derives 65% voting control from aggregating Asher's September 2020 19.55% stake. *See* Compl. ¶ 80. For this opinion, that difference does not render a different conclusion. I refer to 65% to give proper deference to the complaint's allegations at this pleading stage.

[156] Pl. Ans. Br. at 35–36.

[157] *Id.* at 36–38.

[158] *Id.* at 39–41.

[159] *Id.* at 41–43.

sorts of factors.[160]  The nature of a written opinion requires considering each factor in turn before evaluating them holistically.[161]  Here, none offers the clout over National's board Plaintiff says it does, and their combination does not amount to actual control.

### 1.    Stock Ownership

Plaintiff argues that BRF, with its 46.4% stake in National, held a "large enough block" to qualify as a controlling stockholder.[162]  Delaware law is clear:  only a stake over 50% is "large enough" to confer controller status based solely on "mathematical voting control."[163]

To be sure, the law recognizes "power conferred by large block[s]."[164]  BRF's 46.4% stake is significant.  A relatively larger block size means that the stockholder is more likely to prevail on a vote, and requires any opposition to prevail by

---

[160] *Adolf*, 2025 WL 1000153, at *12; *see also Vaxart*, 2021 WL 5858696, at *15 ("Because the controller analysis is fact-intensive, the court is unlikely to find control unless plaintiffs can plead a 'constellation of facts' supporting control." (internal citation omitted)).

[161] *Oracle II*, 2025 WL 249066, at *13 n.98 (confirming a trial court may properly consider "all" the factors individually and "in the aggregate" for a "holistic evaluation").

[162] Pl. Ans. Br. at 34. Plaintiff also points to the fact that BRF's stake used to exceed fifty percent.  Without more, that does not support an inference of actual control over National for purposes of BRF's take-private.

[163] *Oracle II*, 2025 WL 249066, at *11–12 (noting stockholders with "over 50%" stock as having "hard" control and stockholders owning "less than 50%" are not "presumed to be a controlling stockholder with fiduciary duties"); *see also W. Nat.'l*, 2000 WL 710192, at *6 ("[S]ubstantial non-majority stock ownership, without more, does not indicate control.").

[164] *Voigt*, 2020 WL 614999, at *18.

26

obtaining a supermajority.[165]  But beyond those voting dynamics, BRF's sizable stake itself "is not particularly probative of whether the large shareholder exercises actual control" over National for purposes of the merger.[166]  BRF's stake shows only its "potential to control."[167]  Plaintiff must still plead facts showing *actual* control.[168]

The closest Plaintiff comes is alleging BRF's refusal to sell deterred the special committee from pursuing the Management Consortium's bid or considering other buyers.  This is the first instance where Plaintiff conflates BRF's arm's-length leverage with control over National.  Delaware law maintains those as different

---

[165] *Id.*

[166] *See W. Nat'l Corp.*, 2000 WL 710192, at *8 ("The shareholders' right to voice their view as to the advisability of a proposed merger, however, does not indicate that they exercise actual control over the corporation's business and affairs."); *e.g.*, *Rouse Props.*, 2018 WL 1226015, at *19–20 (concluding a complaint failed to allege a 33.5% stockholder was a controller); *Superior Vision*, 2006 WL 2521426, at *1–2, *5 (concluding a complaint did not adequately allege that a 44% stockholder was a controller); *W. Nat.'l*, 2000 WL 710192, at *1, *6 (finding on a motion for summary judgment a 46% stockholder was not a controller); *In Re: Sea-Land Corp. S'holders Litig.*, 1987 WL 11283, at *4–5 (Del. Ch. May 22, 1987) (concluding that a complaint did not adequately allege a 39.5% stockholder was a controller).

[167] *See Williamson*, 2006 WL 1586375, at *5 ("Delaware law requires actual control, not merely the potential to control.").

[168] *Voigt*, 2020 WL 614999, at *19–22 (evaluating 34.8% ownership "in conjunction with" indicia of actual control, including (i) the board composition, and (ii) the minority stockholder's contractual rights and limitations, right to proportionate representation on board committees, and "relatively weak" but additive relationship with the key managers or advisors); *see also Sea-Land*, 1987 WL 11283, at *5 ("That Simmons had a 40% stock interest might permit the inference that Simmons had the potential ability to frustrate a competing bid.  But that circumstance, without more, will not suffice to elevate Simmons' status to that of a controlling stockholder with concomitant fiduciary obligations.").

27

concepts.[169] In *Western National*, the 46% blockholder who bought the shares it did not own indicated it was not willing to sell, and this Court was adamant that the blockholder was within its rights to do so and was not exercising actual control by doing so.[170] In *USG*, a 10.6% blockholder who fought tooth-and-nail in a proxy contest against the board's nominees did not have actual control over the board.[171] Had it "exercised control over [the] board, it inferably would have been able to control" the board's nominees.[172]

BRF's refusal to sell was certainly an obstacle the special committee had to address to get a deal done, and narrowed the options available.[173] But Plaintiff alleges nothing showing BRF controlled or coerced the special committee into exclusive negotiations. Rather, the special committee deliberated its options

---

[169] *W. Nat.'l*, 2000 WL 710192, at *23–24.

[170] *Id.* at *4, *8 (addressing control over the corporation's "business and affairs"). Even if BRF was a controller, BRF was free to decide not to sell its stock without heed to National or its other stockholders. *In re Sears Hometown & Outlet Stores, Inc. S'holder Litig.*, 309 A.3d 474, 508–10 (Del. Ch.), *modified on reargument*, (Del. Ch. July 2, 2024).

[171] *USG*, 2020 WL 5126671, at *14–15.

[172] *Id.* at *15.

[173] *See In re MFW S'holders Litig.*, 67 A.3d 496, 508–09 (Del. Ch. 2013) (observing a significant stockholder's refusal to sell could make it "unlikely that any potentially interested party would" pursue a transaction, but it did not equate to control as the special committee "ha[d] the leeway to get advice" and "evaluat[e] other options"), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

independently and chose to engage with BRF.[174]

## 2.    Significant Voting Support

Plaintiff argues BRF effectively wielded a majority of National's voting power by combining forces with Asher (aggregating to 65%) and management (aggregating to 55%).[175]  For Asher, Plaintiff points to two moments where it appeared "as if [BRF] were acting in concert" with Asher.[176]  For management, Plaintiff alleges BRF and management excluded the board and special committee from their talks on management compensation,[177] and that once they were aligned, they "acted in concert" to push for a sale.[178]  Plaintiff offers no basis to combine BRF's holdings with any other National stockholder.  Nor has Plaintiff shown how any such combined voting power amounted to actual control over National's board in the merger process.

To aggregate different stockholders' power in a way that imposes fiduciary

---

[174] *See W. Nat.'l*, 2000 WL 710192, at *4 (finding no actual control when the special committee independently determined "the optimal course of action" was a negotiated deal with the significant stockholder after evaluating the stockholder's unwillingness to sell, the company's financial and liquidity situation, the market conditions, and "[t]he imminent expiration of the Standstill Provision," which suggested "the optimal time to negotiate . . . was sooner rather than later"); *see also USG*, 2020 WL 5126671, at *14–15 (finding actual control not well-pled when the board independently concluded the minority stockholder was likely to prevail in the proxy contest and authorized merger talks).

[175] Pl. Ans. Br. at 35–36.

[176] Compl. ¶¶ 78, 80.

[177] *Id.* ¶¶ 90, 95.

[178] Pl. Ans. Br. at 35–36.

29

duties, Delaware law requires more than an alignment of interests: it requires some indication of an actual agreement.[179] And that agreement must be well-pled: this Court will not "pile up questionable inferences until [a control group] conclusion is reached."[180]

Plaintiff does not allege any actual agreement to support coupling BRF's voting power with either Asher's or management's. As to Asher, Plaintiff pleads BRF and Asher took separate actions that appeared "as if they were acting in concert" "to "pressure the [b]oard to accept [BRF's] proposal,"[181] and that Asher boosted his holdings "as if" he was aligned with BRF or had advance knowledge of a deal.[182] He points to their separate communications with the board and

---

[179] *Sheldon v. Pinto Tech. Ventures, L.P.*, 220 A.3d 245, 251–52 (Del. 2019) (requiring stockholders to be "connected in some legally significant way—such as by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal") (internal quotation marks and citation omitted); *Crimson Expl.*, 2014 WL 5449419, at *15 (rejecting a control group because the plaintiff did not plead "any voting agreement regarding the Merger or . . . any agreement, formal or otherwise" and alleged only "an alignment of interests"); *Frank v. Elgamal*, 2012 WL 1096090, at *8, *8 n.57 (Del. Ch. Mar. 30, 2012) (looking to "legally significant" connections, such as "contemporaneously entered into" voting agreements, exchange agreements and employment agreements with a post-merger entity, as evidence of a control group); *Dubroff v. Wren Holdings, LLC*, 2011 WL 5137175, at *7 (Del. Ch. Oct. 28, 2011) (reiterating that a control group is not demonstrated merely by alleging a "group of shareholders hav[ing] parallel interests," and finding a control group is pled when the stockholders engaged in a series of meetings "to establish the exact terms and timing" of the challenged transaction).

[180] *Crimson Expl.*, 2014 WL 5449419, at *15.

[181] Compl. ¶¶ 78, 80.

[182] *Id.* ¶ 93.

management, and their shared disappointment in National's performance.[183]  Even viewed in Plaintiff's favor, those allegations suggest independent actions, not joint planning.  Plaintiff alleges no preexisting coordination between BRF and Asher regarding a shared intent to sell their National stake.[184]

Other allegations reinforce that point:  BRF merely "hoped" National would offer Asher the opportunity to sell his shares.[185]  Riley told the board's counsel he "was calling Asher" only after reaching a preliminary agreement with Mullen on management compensation.[186]  At best, Plaintiff pleads BRF and Asher held similar views about National's performance, and took similar independent actions.[187]  Those coinciding or parallel interests are not enough.[188]

There is even less reason to aggregate management's voting power with BRF's.  At the start of merger negotiations, BRF and management were distinct

---

[183] Pl. Ans. Br. at 35 (citing Compl. ¶¶ 76–78, 80, 84–85, 93).

[184] Plaintiff does not allege Asher participated in the sale process until after BRF withdrew its bid.  *See* Compl. ¶¶ 73, 77.

[185] *Id.* ¶ 70.

[186] *Id.* ¶ 84.

[187] *Id.* ¶¶ 77–78, 80.

[188] *Sheldon*, 220 A.3d at 251–52; *see also Gilbert v. Perlman*, 2020 WL 2062285, at *6 (Del. Ch. Apr. 29, 2020) ("To demonstrate the existence of a control group, it is insufficient to identify a group of stockholders that merely shares parallel interests."); *Crimson Expl.*, 2014 WL 5449419, at *15 (holding "mere concurrence of self-interest among certain stockholders" insufficient to allege a control group).

competing bidders for National.[189]  The special committee repeatedly instructed Mullen not to speak with BRF.[190]  Then the special committee granted management and BRF permission to negotiate management compensation, and they struggled for months to reach a deal.[191]  BRF negotiated with management only on management equity awards, and only after BRF and Mullen agreed on the preliminary terms.[192]  Plaintiff does not allege any actual agreement to effectuate the merger.

Perhaps recognizing his allegations fail to plead the necessary agreement or cooperation, Plaintiff was clear he is not alleging a control group:  he seeks to aggregate BRF with Asher or management for "atmospherics."[193]  Given Delaware law's insistence on an actual agreement to bind stockholders together, I have my doubts that Delaware law would recognize "atmospherics," short of a control group, as a source of actual control.

Regardless, Plaintiff has pled no facts showing that any such "atmospherics" contributed to actual control over National's board for purposes of the merger.[194]

---

[189] Compl. ¶¶ 4, 36, 39, 44, 58–59, 85–86.

[190] *Id.* ¶¶ 45, 59, 86.

[191] *Id.* ¶¶ 62, 67, 69–71, 73.

[192] *Id.* ¶¶ 81, 84, 90, 94.

[193] Hr'g Tr. at 48–49 (counsel for Plaintiff conceding he was "not actually asking [the Court] to conclude that there was a control group" or that "BRF [wa]s actually bringing the weight of 65 percent.  These are just atmospherics").

[194] *Sheldon*, 220 A.3d at 251–52; *Patel*, 2021 WL 4482157, at *11 (discussing a plaintiff must "allege that the control group exercised *de facto* control by actual domination or

The allegations show the opposite. In response to pressure from Asher and BRF, the board took independent action. It questioned Mullen's compensation.[195] It reconstituted the special committee to negotiate with BRF.[196] It proposed involving outside advisors on "open points (including compensation-related points).[197] The reconstituted special committee also ran its own independent inquiry into BRF's relationship with Asher.[198] It concluded Asher qualified as a "minority stockholder" unaffiliated with BRF.[199]

As for BRF and management, they did not dominate the special committee. The special committee hired independent advisors.[200] It treated BRF and management as "competing bidders" and barred Mullen from communicating with BRF.[201] It determined the Management Consortium's proposal "was not in the best interest of stockholders," and chose to pursue a deal with BRF.[202] It ordered management and its advisors to prepare updated projections to prepare responses to

---

control of the board generally, or actual domination or control of the corporation, its board, or the deciding committee with respect to the challenged transaction").

[195] Compl. ¶ 79.

[196] *Id.*

[197] *Id.*

[198] *Id.* ¶ 85.

[199] *Id.* ¶ 93.

[200] *Id.* ¶¶ 41, 44.

[201] *Id.* ¶¶ 45, 59, 86.

[202] *Id.* ¶ 88.

BRF's bid.[203]   It instructed its advisors to facilitate compensation negotiations between BRF and management.[204]

Plaintiff offers nothing to support the inference that BRF and Asher, or BRF and management, agreed to work together to exert actual control over National in its transaction with BRF.

### 3.    No Control Over The Board

Next, Plaintiff swings for the fences and claims BRF controlled the board.  He points to three assertions:  (i) NGSP's 2012 investment in National, which Plaintiff attributes to BRF solely based on Riley's involvement; (ii) BRF's high-water mark of 56.1%, which had dropped to 46.4% by the time of the merger; and (iii)  Riley's "business relationship" with Fagenson, a National director.[205]

It takes a great deal to plead that a tough negotiator across the table actually controlled the other side's board, such that it must be deemed a fiduciary and subsume its own interests to those of the other side and its stockholders.[206]  Control over a corporation's board may exist if the stockholder holds or controls "high-status

---

[203] *Id.* ¶¶ 53, 55.

[204] *Id.* ¶ 88.

[205] Pl. Ans. Br. at 36–38.

[206] *Oracle I*, 2023 WL 3408772, at *19–20, 24–25 (concluding post-trial the evidence did not support a 28.4% stockholder had such power "that independent directors cannot freely exercise their judgment for fear of retribution" (internal quotation marks and citations omitted)).

roles . . . [or] key executive or managerial roles," "interfere[s] with or kibosh[es] management decisions," or "has substantial influence [in decisions to] replace management."[207]  Plaintiff's allegations do not meet the mark.

First, NGSP's 2012 investment and BRF's 2018 majority stake are not pled to give BRF any influence over National's board at the time of the merger.[208] Plaintiff offers no facts connecting those facts to the merger board.

Second, Plaintiff points to Riley's past dealings with Fagenson.  Fagenson is one of six directors on the merger board[209]—far from a majority controlled by BRF. And Plaintiff's allegations as to Fagensen fall short as well.  His connection with Riley dates back to 2012, when both were NSGP principals during its National transaction.[210]  But being co-directors and having a single past related business relationship does not undermine a director's independence or disinterestedness.[211]

---

[207] *Tornetta v. Musk*, 310 A.3d 430, 504–03 (Del. Ch. 2024) (internal citations omitted).

[208] Recall Plaintiff's allegation that BRF was interested in National in 2012 because Riley was a principal at NSGP.  *See* Compl. ¶ 18.  Plaintiff alleges no other connection between NGSP and BRF.  BRF's supposed interest in 2012 is not well-pled.  But even taking it at face value, it is irrelevant to my control analysis.  *See Morton's Rest.*, 74 A.3d at 664 (finding allegations of a stockholder's previous ownership of the company before its IPO fell short of pleading control).

[209] Compl. ¶¶ 8, 11–16.

[210] *Id.* ¶ 18.

[211] *See, e.g.*, *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1061 (Del. 2021) ("[A]n outside business relationship [is] insufficient to raise a reasonable doubt that the director lacked independence." (internal quotation marks and citation omitted)); *Beam ex rel. Martha*

Plaintiff offers no facts explaining how Riley, a nonvoting board observer, could have "dominated" Fagenson, at all or in connection with the merger.[212]

Fundamentally, Plaintiff does not allege any director "w[as] employed by or directly under" BRF's control.[213]  No one from BRF "played an active role" on the board, before or during the merger.[214]  BRF's observer, Riley, attended only two board meetings.[215]  Plaintiff alleges nothing about "what [Riley] did or said at those

*Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1051–52 (Del. 2004) ("Mere allegations that they move in the same business and social circles, or a characterization that they are close friends, is not enough to negate independence for demand excusal purposes."); *Orman v. Cullman*, 794 A.2d 5, 27 (Del. Ch. 2002) ("The naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence.").

[212] *See Newman v. KKR Phorm Invs., L.P.*, 2023 WL 5624167, at *5 (Del. Ch. Aug. 31, 2023) (finding directors' independence not impugned absent allegations that the controller "dominated 'them' through a 'close relationship' or 'force of will'"); *see also Morton's Rest.*, 74 A.3d at 665 ("The fact that two employees of Castle Harlan sat on the board, without more, does not establish actual domination of the board, especially given that there were eight directors not affiliated with Castle Harlan.").  There are no facts showing Fagenson's NSGP position depended on Riley, that his compensation from NSGP was material to him, or that he had any "bias-producing" ties to Riley.  *See Beam*, 845 A.2d at 1050. Relationships materially greater in extent, duration, and nature have been found insufficient to rebut a director's presumed independence.  *See generally Zuckerberg*, 262 A.3d at 1060–64; *see also Ligos v. Tsuff*, 2022 WL 17347542, *8 (Del. Ch. Nov. 30, 2022) (finding plaintiff's bare allegation that a director had a 30-year history as a director or employee of controller-related entities, without more, was insufficient to indicate lack of independence).

[213] *W. Nat.'l*, 2000 WL 710192, at *10 (finding plaintiffs' board conflict assertions "counterintuitive" when no director "w[as] employed by or directly under" the minority stockholder's control).

[214] *Id.* at *11.

[215] Compl. ¶¶ 38, 95.

meetings."[216]  Plaintiff also pleads no facts showing BRF could control or reward any director.[217]  Plaintiff has not shown any means by which BRF exerted actual control over the National board.

### 4.    No Control Over The Merger Process

Plaintiff alleges BRF exerted "outsized influence, threats, and intimidation" over the merger process.[218]  Process inquiries are fact-intensive.[219]  Evaluating process integrity for the purpose of determining actual control considers all "possible sources of influence" and "[b]roader indicia of effective control."[220]

Arm's-length, hard-fought negotiations to which the board independently accedes are not tantamount to control over that board.  Two cases illustrate the difference.  In *Western National*, the plaintiff failed to plead a passive 46%

---

[216] *Turnbull v. Klein*, 2025 WL 353877, at *14 (Del. Ch. Jan. 31, 2025) ("Without additional allegations of what [the minority stockholder's board representatives] said or did at those meetings, [the representatives'] attendance on its own does not support an inference of control.").

[217] *Orman*, 794 A.2d at 25 n.50 (discussing control over a board focuses on if the stockholder had "unilateral power (whether direct or indirect through control over other decision makers), to decide whether [any] director continues to receive a [material] benefit, financial or otherwise"); *see also Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002) ("A controlled director is one who is dominated by another party, whether through close personal or familial relationship or through force of will . . . [or] is beholden to the allegedly controlling entity.").

[218] Pl. Ans. Br. at 39.

[219] *Crimson Expl.*, 2014 WL 5449419, at *10 (observing "the actual control factor[s]" are "fact-intensive").

[220] *Basho Techs.*, 2018 WL 3326693, at *26–28.

stockholder was a controller.[221] The stockholder nominated two of eight directors, did not employ or control any director, was not involved in daily operations, bargained at "arm's length," and "never improperly forced a merger."[222] The plaintiff alleged the stockholder had vetoed an earlier transaction, pointing to that as evidence of domination and control; the court rejected that inference.[223]

In *Kahn v. Lynch Communication Systems*, by contrast, the court found a 43% stockholder was a controller.[224] The stockholder held five of eleven board seats; threatened to employ a tender offer if no "negotiated" deal was reached; "vetoed" the acquisition target the independent committee supported; and, through its board designee, warned the other directors, "[w]e are a forty-three percent owner. You have to do what we tell you . . . you are pushing us very much to take control of the company."[225] That designee "scared [the other directors] to death."[226] The Delaware Supreme Court agreed the record was clear: the directors deferred to the blockholder "because of its position as a significant stockholder"—not because they "decided in

---

[221] 2000 WL 710192, at *6–10, *23–25.

[222] *Id.*

[223] *Id.* at *23 (holding a significant minority stockholder "tak[ing] steps to 'veto' a [proposed transaction] . . . is not particularly probative of whether the large shareholder exercises actual control over the business and affairs of the corporation").

[224] 638 A.2d 1110 (Del. 1994).

[225] *Id.* at 1112–14.

[226] *Id.* at 1114.

the exercise of their own business judgment that [the stockholder]'s position was correct."[227]

Plaintiff's allegations do not support an inference that BRF actually controlled the merger process. First, the merger's initiation. BRF proposed the deal, but only after securing a limited waiver of the Standstill Agreement.[228] An indisputably independent board, following its own deliberation, approved that waiver.[229]

Next, the merger's process and terms. Plaintiff asserts BRF dictated the deal by announcing a low offer and the standstill waiver, refusing to sell to a third-party bidder, and setting the merger price.[230] But Plaintiff has not pled BRF controlled National's board or special committee. The complaint tells a story of a board and special committee acting with demonstrated independence. The special committee insisted on *MFW* procedural safeguards, which BRF accepted—not once, but thrice.[231] When both the Management Consortium and BRF were in play, it instructed Mullen not to discuss the bid with BRF.[232] It made room to deliberate, and BRF responded by raising its offer.[233] The special committee directed its

---

[227] *Id.* at 1115.

[228] Compl. ¶¶ 30–33.

[229] *Id.* ¶¶ 30, 33.

[230] *See* Pl. Ans. Br. at 39–40.

[231] Compl. ¶¶ 49, 66, 92.

[232] *See, e.g., id.* ¶¶ 45, 59, 86.

[233] *Id.* ¶¶ 47, 51, 53, 95–97.

financial advisor to prepare National's projections to guide its response.[234] It also

set its own schedule to counter BRF's offer.[235] Each step shows independent

decisionmaking.[236] BRF did not attend any special committee meetings or try to

influence its process and deliberation.[237] That BRF withdrew its initial bid—not

forcing a deal—shows even on a plaintiff-friendly reading that the special committee

---

[234] *Id.* ¶¶ 49, 53, 55, 97–98.

[235] The special committee took approximately two months before making a counterproposal to BRF's April 30 proposal, despite BRF's "frustration with the timeline" and repeated request for a "speedy process." *See, e.g., id.* ¶¶ 33, 44–45, 47–49, 51, 53, 56. After the merger talks resumed in September, the special committee took nearly a month to assess the value impact from the Palantir fees. *See id.* ¶¶ 95, 97.

[236] *See USG*, 2020 WL 5126671, at *25 (observing the board "declin[ing stockholder's advocated action], instead proceeding with negotiations on a more measured timeline" was not control).

> Plaintiff's cases involve stronger control factors. Pl. Ans. Br. at 34–38. In *Voigt*, a 34.8% blockholder was found a controlling stockholder when it (i) filled one-third of the board seats with individuals it controlled, (ii) had another third of the directors beholden to it, (iii) had broad blocking rights, (iv) possessed additional sources of board-level influence, and (v) maintained relationships with key executives and advisors. 2020 WL 614999, at *15–22. In *Tornetta*, a 21.9% stockholder was found to have actual control when he had maximum managerial authority, controlled half of the board, and dictated the transaction's timing, process, and terms. 310 A.3d 430. In *Basho Technologies*, a significant minority stockholder was found to be a controlling stockholder based on an avalanche of factors, including its contractual blocking rights, dominance over management, and actual threat to withhold critical funding the company needed. 2018 WL 3326693, at *24.

[237] *Turnbull*, 2025 WL 353877, at *14 (finding transaction-specific control not pled absent any allegations that the minority stockholder "steered the negotiations or otherwise dominated the [b]oard" (internal quotation marks and citation omitted)); *see also W. Nat.'l*, 2000 WL 710192, at *21–27 (finding no control over the special committee process when it retained independent advisors, was informed and not misguided, and vigorously negotiated on an arm's length basis).

"had a genuine choice as to the ultimate fate of the [c]ompany."[238]

Plaintiff argues BRF controlled the process through "unauthorized conversations" with Mullen-led management and a supposed conspiracy to hide facts about the Palantir fees.[239] Neither amounts to actual control.

BRF's talks with Mullen amidst a bidding war may reflect an imperfect process, but not control over National. In May 2020, presented with BRF's and management's competing bids, the special committee barred management from discussing its bid with BRF.[240] The complaint does not allege the ban applied to BRF or that BRF even knew of it. Almost a month later, Riley called Mullen and learned he was helping with the Management Consortium's bid.[241] Plaintiff does not allege they discussed the merger terms or plotted against the special committee. BRF did not negotiate compensation with management until it had the special committee's approval.[242] In September, after BRF renewed its bid, it discussed management compensation with Mullen—before the special committee was

---

[238] *W. Nat.'l*, 2000 WL 710192, at *24 ("[T]he fact that American General was willing to terminate the negotiations and place Western National in a *status quo ante* posture indicates that the Special Committee had a genuine choice as to the ultimate fate of the Company. That is, American General was simply not going to force a deal on Western National if the Special Committee did not accept its terms.").

[239] Pl. Ans. Br. at 39–40.

[240] Compl. ¶ 45.

[241] *Id.* ¶ 54.

[242] *Id.* ¶¶ 62, 67.

reconstituted and before any new restriction on their communications was imposed.[243] Mullen allegedly "steered" the special committee toward BRF's deal by resubmitting a management proposal the special committee had already rejected.[244] Once reconstituted, the special committee "prohibit[ed BRF and management] from engaging in unauthorized discussions"[245] and required its representatives to attend any negotiations.[246] BRF and Mullen allegedly disobeyed those directives and negotiated management compensation without the special committee's oversight.[247]

Those talks may have strayed from the ideal. But they do not support an inference that BRF controlled National, or overrode the special committee. BRF and management were negotiating counterparties as to management compensation, and remained competitors as to the merger, with rival offers before the special committee. The complaint does not allege BRF and management negotiated the merger terms[248] or infiltrated the special committee. Nor does it allege the committee lacked the power to reject or revise any compensation deal.

---

[243] *Id.* ¶¶ 79, 86.

[244] *Id.* ¶¶ 87–88.

[245] *Id.* ¶ 86.

[246] *Id.*

[247] *Id.* ¶ 90.

[248] *Cf. id.* ¶ 89 (alleging BRF negotiated merger price with KBW).

Plaintiff's claim of a BRF-management conspiracy to hide the Palantir fees is not well-pled.[249] The complaint does not allege BRF even knew about the fees before December 2020, when management disclosed them to the board.[250] That meeting was only the second (and final) one Riley attended as an observer.[251] There is no basis to infer a conspiracy that wielded actual control. Rather, the special committee halted all merger talks, ordered management to quantify the value impact, and raised its counteroffer to $3.50[252]: evidence of its independence.

Next, BRF's alleged threats. "A pattern of threats aimed at intimidating [the board]" could support an inference of domination over the board.[253] Plaintiff asserts BRF repeatedly threatened a change of control and that National caved in

[249] Pl. Ans. Br. at 40.

[250] Compl. ¶ 95.

[251] *Id.*

[252] *Id.* ¶ 97.

[253] *N.J. Carpenters Pension Fund v. Infogroup, Inc.*, 2011 WL 4825888, at *11 (Del. Ch. Sept. 30, 2011); *see also Kahn*, 638 A.2d at 1114 (finding a 43.3% stockholder a controlling stockholder when it "dominat[ed] [the company's] corporate affairs," including by threatening the board with references to its sizable stake); *In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at *21–22 (Del. Ch. Sept. 19, 2008) (finding post-trial that a stockholder owning 35.9% of the company's stock was a controller where the controller had rights to block important strategic initiatives, was a significant creditor that could unilaterally force redemption of notes, and maintained publicly that it controlled the board); *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 912–13 (Del. Ch. Aug. 20, 1999) (finding 49% stockholder to be a controller where that stockholder also held an option to purchase 2% more of the outstanding stock, owned all of the company's debt, and successfully threatened the board into reducing the per share merger price from $1.30 to $0.30).

response.[254]  In late July, having heard nothing from the special committee, Riley "stated that if the proposed transaction did not proceed, he intended to affect a change-of-control transaction after the standstill expired."[255]  In August, after talks about management's equity awards fell apart, BRF told National its options were seeking control after the standstill expired, or selling to somebody willing to pay more.[256]

BRF's statements manifest a bidder pointing out it has alternatives down the road, leaving the directors free to respond in their independent business judgment.[257]  They did not exert control over the special committee.  Compare the bidder in *Kahn*.  There, one of the blockholder's five directors told the other six, "You have to do what we tell you."[258]  The blockholder then threatened a tender offer unless a deal was struck.[259]  That is an example of a bidder using the threat of a tender offer together with its board presence to cow other directors.  No such coercion is alleged here.

---

[254] Pl. Ans. Br. at 39–41.

[255] Compl. ¶ 67.

[256] *Id.* ¶ 70.

[257] *See Sears*, 309 A.3d at 507 ("A share of stock is a form of intangible property that reifies a bundle of rights that its holder can exercise.  The three most familiar are the rights to sell, vote, and sue.").

[258] *Kahn*, 638 A.2d at 1114.

[259] *Id.*

Plaintiff next raises the September 11 Email as a "threat." In it, Riley voiced frustration with National's performance and management.[260] He opened by saying he would be "better served staying quiet and not 'threatening' the board," and closed with, "I won't stop holding you, management, and the board accountable."[261] That email made no demands, contained no ultimatums, and conveyed no consequences. Crucially, it came after BRF had withdrawn its bid—and before negotiations resumed.[262] At most, the email voiced Riley's dissatisfaction with National's performance. Riley had raised similar concerns since 2019, long before any transaction was on the horizon.[263]

Plaintiff alleges no fact to suggest the email—on its own or with other indicia of control—caused the board to bend to BRF's will.[264] Plaintiff argues he has "probative evidence" that the board gave in to BRF's "threat."[265] First, that National

---

[260] Compl. ¶ 78.

[261] *Id.*

[262] *Id.* ¶¶ 73, 81, 92.

[263] *Id.* ¶ 27.

[264] *See supra* n.253.

[265] Plaintiff also argued the special committee's insistence on *MFW* protections is a dispositive "acknowledge[ment]" that BRF was a controller. Compl. ¶ 45; *see also* Pl. Ans. Br. at 42. But when questioned at oral argument, Plaintiff's counsel quickly dropped the point. Hr'g Tr. at 59–60 ("The Court: Is there any precedent for the establishment and pursuit of an MFW framework to eliminate the opportunity to argue that the counterparty is not a controller? That seems to be a remarkable conclusion. Attorney Monteverde: Well, then I would fall back . . ."). "Forming a special committee serves as evidence of sound corporate governance, not control—and it *limits* a stockholder's ability to exercise

questioned Mullen about executive pay.[266] When BRF challenged management's above-market pay, the board considered the issue seriously, and independently, then let Mullen negotiate revised terms.[267] These actions do not reflect control. They reflect an engaged board making independent, informed decisions in response to a bidder's concerns.

Plaintiff also asserts National pushed away potential bidders in response to BRF's "threats."[268] The special committee's decision not to explore third-party transactions is at the core of Plaintiff's control theory.[269] But the special committee recognized it would lose leverage once the standstill expired before Riley brought it up.[270] And it concluded it would not consider any third-party proposal or pursue management's bid before any alleged "threat."[271] The special committee had decided against third-party bidders and to focus on BRF weeks before Riley's July 28 email.[272] Riley's email only prompted the special committee to tell Mullen about

---

transaction-specific control." *Turnbull*, 2025 WL 353877, at *14 (internal quotation marks and citation omitted) (cleaned up).

[266] *See* Pl. Ans. Br. at 38.

[267] Compl. ¶¶ 27, 50, 67, 79, 88.

[268] *See* Pl. Ans. Br. at 38.

[269] Compl. ¶¶ 4, 48, 63.

[270] *Id.* ¶ 51.

[271] *Id.* ¶¶ 48, 63.

[272] *Id.* ¶ 63 (alleging "[o]n July 12, 2020, the [s]pecial [c]ommittee determined *not* to engage with a third-party that had reached out regarding a transaction"); *see also id.* at ¶ 48

46

that decision.[273]  The complaint does not plead BRF controlled those decisions or the board.

And in any event, BRF did not block alternatives:  the special committee, exercising its independent business judgment, concluded that a third-party transaction was not feasible.  It evaluated the Management Consortium's competing proposal, "acknowledged" any alternative transaction likely required BRF's support, recognized BRF's stated intention not to sell could deter rival bidders, and ultimately "determined not to reach to any third parties."[274]  It recognized BRF's substantial ownership in National would likely discourage other potential bidders.[275]  That reflects an independent practical assessment of reality, not being controlled.[276]

### 5.    Internal Correspondence

Finally, Plaintiff argues BRF is a controller because National said it was. Management claimed National's "controlling ownership" suppressed the stock

---

(alleging "[o]n June 3, 2020, the [s]pecial [c]ommittee . . . likewise determined not to reach to any other third party").

[273] *Id.* ¶ 67.

[274] *See, e.g., id.* ¶¶ 45, 52 (alleging the special committee "acknowledged" BRF's support would likely be a requisite for any alternative transaction and its stated intention not to sell could make such alternative "impossible"); *id.* ¶ 48 (asserting the special committee "determined not to reach out to any third parties"); *id.* ¶¶ 48, 52 (BRF's stated intention not to sell its National stake).

[275] *Id.* ¶ 88.

[276] *USG*, 2020 WL 5126671, at *24.

price.[277]   And the special committee recognized BRF "could potentially be viewed as a controlling stockholder."[278]   And in the Section 220 Action, National pled that "[National] admits that [BRF] was a majority shareholder of the Company.[279]

But as Plaintiff's counsel conceded during oral argument, National's internal characterizations and Section 220 Action filing are not dispositive on actual control.[280]   They are "indication[s]" to support control allegations.[281]   They do not supplant Plaintiff's pleading burden to allege actual control.[282]

At bottom, the complaint fails to allege BRF exercised transaction-specific control over the merger process.   While BRF held a significant stake, it had no agreement or arrangement with Asher or management to wield more voting power than its own.   It did not control the board or dictate decisions belonging to the board.   It participated in the merger process at arm's length from the board and special committee.   And perception of its (potential) controlling stockholder status does not equate to actual control.   Plaintiff has not shown the combination of BRF's historic interest in National, its historic and current holdings, National's recognition of those

---

[277] Compl. ¶ 76.

[278] *Id.* ¶ 36.

[279] Pl. Ans. Br. at 42.

[280] Hr'g Tr. at 50.

[281] *Id.*

[282] *Id.* at 50–51.

holdings, and negotiation leverage rose to the level of actual control over National's board. There is no well-pled allegation BRF dictated terms, directed decisions, or compelled outcomes. The board functioned independently. The special committee led the merger negotiations and reached its conclusions based on its own judgment. BRF's motion to dismiss is granted.

## III. CONCLUSION

BRF's motion to dismiss is GRANTED. Count II of Plaintiff's complaint is dismissed with prejudice.